UNITED STATES of America, Plaintiff–Appellee,

v.

Joaquin GARCIA, Defendant–Appellant.

Joaquin GARCIA, Plaintiff–Appellee,

v.

Margaret C. HAMBRICK, Warden, Metropolitan Detention Center Los Angeles, Defendant–Appellant.

Nos. 90–50316, 90–56082.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 1, 1993.

Decided June 10, 1993.

Freddie Fletcher, Los Angeles, CA, for defendant-appellant and plaintiff-appellee Garcia.

David S. Tennant and Julie Ryan, Asst. U.S. Attys., Los Angeles, CA, for plaintiff-appellee U.S. and defendant-appellant Margaret C. Hambrick.

Before: SCHROEDER, THOMPSON and O'SCANNLAIN, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

In his direct appeal in *United States v. Garcia*, No. 90–50316, Joaquin Garcia appeals his convictions after a bench trial on five counts of possession with intent to distribute cocaine and heroin, 21 U.S.C. § 841(a)(1); two counts of weapons possession, 26 U.S.C. §§ 5861(i) and 5871 and 18 U.S.C. §§ 922(*o*)(1) and 924(d); and one count of using a machine gun during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1). Garcia contends the district court erred in determining that police officers did not violate the Fourth Amendment when, without a warrant, they walked up to the back door of his apartment, talked to the occupants for five minutes while pretending to be apartment hunters, looked through a dark screen door and saw Garcia holding cocaine, and then gained entry and arrested him inside. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.[1]

In *Garcia v. Hambrick*, No. 90–56082, the government appeals from the district court's judgment granting Garcia's petition under 28 U.S.C. § 2255 to vacate his conviction for violating 18 U.S.C. § 924(c), one of the counts of which he was convicted in his bench trial. The district court vacated the section 924(c) conviction because it concluded that, as to this count, Garcia had received ineffective assistance of counsel during his trial. We have jurisdiction under 28 U.S.C. §§ 1291 and 2255 and we reverse.

## FACTS

On August 10, 1989, Los Angeles County Sheriffs Deputies Beers, Letizio and three others conducted undercover surveillance of an apartment complex on Beechwood Drive in Southgate, California.[2] Two months earlier, an informant had reported that narcotics were being sold there from Apartment B, one of three units in the complex. Apartment A is a detached single-family home. It

is located on the east side of Beechwood Drive. A driveway on the south side of this house leads to an open parking area behind it. To the east of the parking area is a garage. It is attached to a two-story duplex, Apartments B and C. The front of these apartments faces south. Back entrances and porches are around the garage in back facing north. The area in front of Apartments B and C has a walkway and landscaping. The area in back is bare. When looking north at the front of Apartments B and C, B is on the left and C is on the right.

The officers stopped and questioned the apartment manager. The manager told them the tenants of Apartment B had vacated the premises, and that she believed a cleaning crew was inside. The manager told the officers that Apartment B was the "left apartment."

The officers did not have a search warrant. Nevertheless, they drove onto the driveway and parked their van. Cars were parked in the parking area in such a way that the officers could not see the front of Apartment B, the walkway leading to its front door, or the shrubbery along the south side of the walkway.

Deputies Beers and Letizio decided to pose as prospective renters looking for an apartment. They hoped to convince the cleaning crew they expected to find in Apartment B to let them enter. They wanted to get inside Apartment B to determine if the 60–day–old tip of narcotics activity at that location was still valid.

Beers and Letizio walked around the garage to the back of Apartment B, onto the back porch and up to the back door. The back door had a sliding glass door which was open. A dark metallic screen door, however, was closed. The officers shaded their eyes and pressed their faces against the screen so they could see into the apartment. Inside, they saw Cesar Cebreros at the back door and the defendant Garcia in the distance lying on the living room floor.

---

1. We have considered and rejected the government's contention that the district court abused its discretion in granting Garcia an extension of time to file a notice of appeal.

2. A diagram of the complex is attached to this opinion.

The officers asked Cebreros questions about rent and the neighborhood. Garcia translated from his position on the living room floor. The conversation lasted approximately five minutes. The officers were doing their best to see through the darkened screen throughout the conversation. They asked Garcia to join the conversation at the door. When Garcia got up, the officers saw that he was holding a "kilo-sized" package wrapped in tape. They suspected it contained cocaine. Garcia put the package down and came to the door.

Deputy Letizio had an empty soda pop bottle in his hand. He asked Garcia to throw it away for him. When Garcia opened the screen door to take the empty bottle, the officers grabbed the door to keep it from closing. Beers then flashed his badge and said, in a normal tone of voice, "we're police officers, we'd like to talk to you." Garcia said "okay," nodded his head, and stepped back into the house and out of the doorway. Deputy Beers entered the apartment and pushed Garcia against a wall in the kitchen. Letizio signaled the three officers in the van, and all of them entered the apartment. No guns were drawn.

During a sweep of the apartment, the officers found and seized the package Garcia had held. It contained 1,021 grams of cocaine. Upstairs, the officers found a machine gun in plain view and two other guns in a closet. Deputy Beers then placed Garcia under arrest. After obtaining Garcia's written consent to conduct a further search, the officers found 24 grams of cocaine base hidden in a wall heater plus empty wrappings, cutting agents, and other tools of the drug trade.

The next day, August 11, deputies returned with a search warrant. They found 3.5 kilograms of cocaine, a kilogram of heroin, and 100 grams of cocaine base all under a false floor in an upstairs closet.

Deputy Beers later testified that the apartment appeared to be a typical stash house where drugs are stored and weapons are kept to protect the merchandise. The apartment was sparsely furnished. The only bed was in the room with the machine gun. The living room was empty. A resident of Apartment C testified that she had seen Garcia at the duplex several times in the months prior his arrest.

## PROCEEDINGS

Garcia filed a motion to suppress the evidence seized on August 10 and 11. On November 20, 1989, the district court held a hearing, and the next day denied the motion in a telephonic ruling. The ruling was not placed on the record at that time. After a bench trial, Garcia was convicted of all eight drug and weapons offenses charged in the indictment. The court imposed a 165–month sentence on the five drug counts, a concurrent 120–month sentence for two counts of possession of weapons without serial numbers, and an additional 360–month consecutive sentence for using or carrying a machine gun in a drug offense, 18 U.S.C. § 924(c)(1).

Immediately following sentencing, Garcia petitioned the district court under 28 U.S.C. § 2255 to set aside his section 924(c)(1) conviction. The court granted the petition. It held that Garcia's trial counsel had been ineffective because during the trial he had failed to bring to the court's attention *United States v. Phelps,* 877 F.2d 28 (9th Cir.1989). The district court determined that under *Phelps* no rational trier of fact could find Garcia guilty beyond a reasonable doubt of using a gun in committing a drug offense in violation of 18 U.S.C. § 924(c)(1).

## DISCUSSION

A. District Court's Supplement of Record on Appeal Under Rule 10(e)

On August 5, 1991, after Garcia's opening brief had been filed in his direct appeal, we granted the government an extension of time to file its answering brief. On August 23, 1991, the district court signed and entered a 32–page written order denying Garcia's suppression motion. This order set forth detailed findings, conclusions and reasons for the court's November 21, 1989 telephonic denial of Garcia's motion to suppress. The order was prepared by the government and adopted without change by the district court to supplement the record on appeal under Federal Rule of Appellate Procedure 10(e).

The government then filed its answering brief. Garcia filed a motion objecting to the district court supplementing the record on appeal. We denied that motion as moot, but invited Garcia to file a motion for permission to file a revised opening brief. He filed that motion, we granted it, and Garcia filed his revised opening brief. With our permission, the government then filed its supplemental answering brief.

Garcia argues that the government's conduct in waiting more than 1½ years to ask the district court to enter its written order denying his suppression motion unfairly prejudiced him. By the time that order was filed, Garcia had already filed his opening brief in this court. He correctly points out that the district court's August 23, 1991 written order undercuts some of the contentions he made in his opening brief. He asks us to review the district court's decision to supplement the record with the August 23, 1991 order for prejudicial effect and the denial of fair play and substantial justice.

Federal Rule of Appellate Procedure 10(e) provides:

**Correction or Modification of the Record.** If any difference arises as to whether the record truly discloses what occurred in the district court, the difference shall be submitted and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the district court either before or after the record is transmitted to the court of appeals, or the court of appeals, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the court of appeals.

Fed.R.App.P. 10(e) (1991).

■ The district court may not use Federal Rule of Appellate Procedure 10(e) to supplement the record with material not introduced or with findings not made. *See United States v. Walker,* 601 F.2d 1051, 1054–55 (9th Cir.1979) (affidavits not in original record disallowed); *Shew v. Brownell,* 219 F.2d 301, 302 (9th Cir.1955) (new findings correcting court's original erroneous statement of the burden of proof disallowed); *see also United States v. Hillsberg,* 812 F.2d 328, 336 (7th Cir.) (affirming district court's decision to exclude an affidavit offered under Rule 10(e) that undermined the jury's verdict), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987).

When the district court under Rule 10(e) settles a dispute about what occurred in proceedings before it, "the court's determination is conclusive 'absent a showing of intentional falsification or plain unreasonableness.'" *United States v. Serrano,* 870 F.2d 1, 12 (1st Cir.1989) (quoting *United States v. Mori,* 444 F.2d 240, 246 (5th Cir.) (approving corrections offered after the appellant had filed an opening brief), *cert. denied,* 404 U.S. 913, 92 S.Ct. 238, 30 L.Ed.2d 187 (1971)).

■ ■ Garcia has made no showing that the August 23, 1991 order is intentionally false or plainly unreasonable. The district court simply overlooked entry of a written order after it telephonically denied Garcia's motion to suppress. Nor has there been any showing that the government deliberately attempted to mislead or take advantage of Garcia by not requesting the district court to enter its written order sooner.

When the district court was presented with the proposed written order it signed and filed it. In doing so it supplemented the record with its written order pursuant to Federal Rule of Appellate Procedure 10(e). Any unfairness to Garcia in the timing of the entry of this order was dispelled by this court's order permitting Garcia to file a revised opening brief. In this brief, Garcia's counsel clearly sets forth Garcia's arguments and identifies where in the order of August 23, 1991 he believes the district court erred. These points were further ably argued by Garcia's counsel before this court at oral argument.

We conclude that the district court did not err in supplementing the record on appeal with its written order of August 23, 1991 denying Garcia's motion to suppress. We

next consider Garcia's Fourth Amendment arguments.

## B. Garcia's Motion to Suppress

1. Did the officers conduct a Fourth Amendment search of Garcia's residence because they looked into the apartment from an unlawful vantage point?

■ "We review *de novo* motions to suppress, and any factual findings made at the suppression hearing for clear error." *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1282 (9th Cir.1992) (challenge to validity of warrant). Whether the facts found by the district court constitute a "search" under the Fourth Amendment is a mixed question of law and fact reviewed de novo. *See United States v. Roberts*, 747 F.2d 537, 540 (9th Cir.1984).

■ The district court found that the officers had a subjective good faith belief that they were going to the front door of Apartment B when they actually went to the rear. Garcia contends that this finding is clearly erroneous. He points to evidence in the record that the front was marked and landscaped, and argues that the officers' story of mistaking the back door for the front is incredible. We reject this argument.

Deputy Beers testified that because the manager told him that "B" was the "left apartment," he walked to the left of the garage around to the back of Apartment B and found the back door open. He testified that he and Letizio did not see any landscaping because their view was blocked by a parked car. The district court found the officers' testimony credible, and this finding is not clearly erroneous.

Garcia argues that when the officers stepped onto his back porch they entered the curtilage of his home and this warrantless entry violated the Fourth Amendment. He contends the district court should have suppressed the evidence that the officers saw him, from their vantage point on the back porch, carrying the kilo-sized package. *See Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 2307, 110 L.Ed.2d 112 (1990) ("It is, of course, an essential predicate to any valid warrantless seizure that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed.").

■ We have held that officers walking up to the front door of a house can look inside through a partially draped open window without conducting a Fourth Amendment search. *United States v. Hersh*, 464 F.2d 228 (9th Cir.), *cert. denied*, 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301 (1972). This circuit and other circuits have also recognized that officers must sometimes move away from the front door when they are attempting to contact the occupants of a residence. Generally, the subsequent discovery of evidence in plain view does not violate the Fourth Amendment. *See United States v. Daoust*, 916 F.2d 757, 758 (1st Cir.1990) (if front door is inaccessible, "there is nothing unlawful or unreasonable about going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person."); *United States v. Wheeler*, 641 F.2d 1321, 1327 (9th Cir.1981) (officer was acting with a legitimate purpose when he looked over a fence intending to call out to the defendant and then spotted contraband in the yard); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir.1977) ("We cannot say that the agents' action in proceeding to the rear after receiving no answer at the front door was so incompatible with the scope of their original purpose that any evidence inadvertently seen by them must be excluded as the fruit of an illegal search."); *United States v. Freeman*, 426 F.2d 1351, 1352–53 (9th Cir.1970) (no search when officers spotted marijuana in plain view at the rear of an apartment after climbing a stairway which provided access to both the rear and front of eight second floor apartments).

■ In these cases, no search, and hence no Fourth Amendment violation, occurred when officers observed criminal activity with the naked eye from a vantage point accessible to the general public. That is the case here. The officers reasonably believed that they were at the main entrance to Apartment B. They were no different than any other member of the public. If the front and back

of a residence are readily accessible from a public place, like the driveway and parking area here, the Fourth Amendment is not implicated when officers go to the back door reasonably believing it is used as a principal entrance to the dwelling. *See Freeman*, 426 F.2d at 1352–53.

■ By standing on the back porch of Apartment B and looking through the mesh screen door, the officers did not make an unlawful entry or conduct an unlawful search in violation of the Fourth Amendment.

2. Did the officers unreasonably maintain a disguise to engage Garcia in conversation and obtain evidence?

We next consider whether the undercover officers' action in remaining on the porch and talking to Garcia and Cebreros for five minutes while they pretended to be looking for an apartment turned the subsequent sighting of Garcia holding cocaine into a warrantless Fourth Amendment search.

■ In some circumstances, officers can obtain an invitation to enter a private place through a ruse in order to investigate criminal activity. *Lewis v. United States*, 385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966); *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir.1990). There are limits to this, however.

■ An officer cannot use an invitation to enter and buy narcotics as an excuse to "conduct a general search for incriminating materials." *Lewis*, 385 U.S. at 211, 87 S.Ct. at 427. Nor can a government agent obtain entry "by misrepresenting the scope, nature or purpose of a government investigation." *Bosse*, 898 F.2d at 115 (federal agent posed as a state license inspector in order to gather evidence to support a search warrant); *see also United States v. Phillips*, 497 F.2d 1131, 1134–35 (9th Cir.1974) (officers misrepresented their purpose as investigating a robbery when they intended to enter and arrest the defendant for a completely different crime); *but see United States v. Allen*, 675 F.2d 1373, 1382 (9th Cir.1980) (officer who never revealed his identity as a government agent did not misrepresent his purpose for seeking entry). Finally, general Fourth Amendment

principles apply: the ruse becomes a search if it intrudes on the person's reasonable, subjective expectation of privacy. *See California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986).

■ Here, the officers' ruse did not cause Garcia to reveal the package of cocaine. He did that on his own. He was lying on the floor as he acted as an interpreter between the officers on the back porch and Cebreros. Garcia got up off the floor when he approached the officers to talk directly with them. When he did so, he made no attempt to conceal the package of cocaine. The inescapable inference is that he did not care whether the persons standing on the back porch, who he thought were potential renters, saw what he was holding.

■ One has an expectation of privacy in his residence, *United States v. Winsor*, 846 F.2d 1569, 1572 (9th Cir.1988) (en banc), but not as to items which are in plain view and may be seen by persons from a place they have a legitimate right to be. *United States v. Orozco*, 590 F.2d 789, 792 (9th Cir.), *cert. denied*, 439 U.S. 1049, 99 S.Ct. 728, 58 L.Ed.2d 709 *and* 442 U.S. 920, 99 S.Ct. 2845, 61 L.Ed.2d 288 (1979). Thus, Garcia had no expectation of privacy in the package he so cavalierly displayed. The officers saw what anyone looking in from the back porch would have seen—a package. True, because of their training and experience as police officers, the package was of more significance to them than it might have been to a casual observer. But neither their status as police officers, nor their ruse in posing as potential renters, created an expectation of privacy where none existed. There was no search in violation of the Fourth Amendment.

3. Was Garcia's warrantless arrest improper?

■ Garcia argues that his arrest was illegal because the officers entered his apartment without a search warrant in violation of the Fourth Amendment. *See Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The district court held that an exception to the warrant requirement applied in this case, namely that Garcia con-

sented to the officers' entry.[3] "A district court's finding that a person consented to a search is generally treated as a factual determination, reversible only if clearly erroneous." *United States v. Shaibu*, 920 F.2d 1423, 1425 (9th Cir.1990). However, if we are determining whether specific types of actions are sufficient to give rise to an inference of consent, the standard of review is de novo. *Id.*

Garcia does not dispute the district court's findings of fact as to the entry into his apartment. Relying on *Shaibu*, he argues that the facts found do not rise to the level of implied consent. In *Shaibu*, the officers followed the defendant through the open door to his apartment without requesting permission to enter. The defendant made no affirmative motion and said nothing implying consent. *Id.* at 1424. The district court's determination that the defendant had impliedly consented to a search was reversed: "We hold that in the absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent." *Id.* at 1428. *See also Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968) (voluntary consent requires more than mere acquiescence to lawful authority); *Johnson v. United States*, 333 U.S. 10, 13, 17, 68 S.Ct. 367, 368, 370, 92 L.Ed. 436 (1948) (a woman who opened her door for officers who asked to talk to her had not consented to a search).

■ Here, the officers tricked Garcia into opening the door, grabbed the door, flashed a badge and said, "we'd like to talk to you." Garcia said, "okay," nodded and stepped back. Garcia argues that the step back no more implies consent than Shaibu's leaving the door open. He points out that the officers did not specifically request entry, and that both the request and the consent cannot be inferred. *Shaibu*, 920 F.2d at 1428.

The district court, however, determined that Garcia understood the request to talk as a request to enter, a finding that is not clearly erroneous. In *Shaibu*, the officers said nothing that could have been understood

as a request to enter. Here, consent to enter can be inferred from Garcia's step back, which the district court found cleared the way for the officers' entry. Garcia didn't have to step back to continue his conversation with the officers who were then outside the door. The step back occurred in response to the flash of the officer's badge and statement, "we'd like to talk to you." The step back coincided with Garcia's nod and statement, "okay." By contrast, Shaibu did nothing that would have led the officers to believe that they had permission to step across the threshold into his residence.

Other authority supports the district court's determination that both the request to enter and Garcia's actions were sufficient to support a finding of consent. *See United States v. Donlon*, 909 F.2d 650, 655 (1st Cir.1990) (defendant ordered officers off his property, but then opened the screen door to his house so that they could enter); *United States v. Griffin*, 530 F.2d 739 (7th Cir.1976) (after slamming door on officers the first time they knocked, defendant opened door and stepped back in response to second knock); *accord United States v. Impink*, 728 F.2d 1228, 1233 n. 3 (9th Cir.1984) ("In most implied consent cases, the suspect himself takes some action that implies consent—he gestures to the police to enter … or assists in the search of others." (citation omitted)).

We conclude that the officers' request to talk, combined with Garcia's affirmative response and step back clearing the way for the officers' entry are sufficient to give rise to an inference of consent. *See Shaibu*, 920 F.2d at 1425.

■ Garcia contends that even if his actions were sufficient to infer consent to enter, his consent was involuntary because the officers tricked him into opening the door and then grabbed the door.

"[T]he question whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circum-

---

3. The district court also held that the entry was justified by exigent circumstances. Because we uphold the district court's finding of consent, we need not address exigency.

stances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). "A trial court's finding on voluntariness should not be overturned unless it is clearly erroneous." *United States v. Al-Azzawy*, 784 F.2d 890, 895 (9th Cir.), *cert. denied*, 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986).

The officers did not obtain consent involuntarily through their ruse of posing as renters. The ruse had ended by the time Garcia gave consent. Before they asked to talk to Garcia, the officers revealed their true identities. Garcia's reliance on *United States v. Bosse*, 898 F.2d 113 (9th Cir.1990), is misplaced. There, the defendant did not know a federal officer was searching his house.

Garcia asserts that the officers' grabbing the door created a coercive atmosphere compelling consent. The district court rejected this argument, relying on the unthreatening tone of the officers, and the fact that no weapons were displayed. Garcia was not startled or surprised into giving consent. We conclude the district court's finding that Garcia's consent was voluntary in light of the totality of the circumstances is not clearly erroneous.

Garcia also contends that his warrantless arrest was invalid because probable cause for his arrest was lacking. He argues that the written consent he signed for the search of his apartment was the fruit of the invalid arrest. From this he argues that the additional drugs and drug paraphernalia found as a result of the expanded search which followed his written consent should be suppressed. We reject this argument.

■■ We review de novo a district court's finding of probable cause. *United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1295 (9th Cir.1988). "Probable cause requires 'a reasonable belief, evaluated in light of the officer's experience and the practical concerns of everyday life, that the suspect[ ] . . . committed a crime.'" *United States v. George*, 883 F.2d 1407, 1412 (9th Cir.1989)

(quoting *United States v. Robertson*, 606 F.2d 853, 858 (9th Cir.1979)).

■■ The district court found that Garcia was not placed under arrest until after the officers discovered cocaine in the package he had held and after they had found the machine gun upstairs. Garcia argues he was arrested when Deputy Beers first entered the apartment, placed him against the wall and asked him twice if anyone else was inside the apartment. We review de novo the district court's determination of when the detention became an arrest. *See United States v. Harrington*, 923 F.2d 1371, 1373 (9th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991).

The district court's finding was correct. The officers gained lawful consent to enter the dwelling. The record shows that Garcia was not unreasonably restrained when he was placed against the wall. The officers needed to find out for their own safety whether other people were in the apartment. It was reasonable for the officers to restrain Garcia while they determined this. Garcia was not handcuffed and no guns were drawn until he said other people were in the residence. At that point he was handcuffed incident to the officers' protective sweep of the apartment for their safety. *See Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (no probable cause required to sweep home to secure officers' safety); *United States v. Flippin*, 924 F.2d 163, 165–66 (9th Cir.1991) (following a consent entry, no probable cause is needed to pat down for weapons as long as the pat down is independently justified by reasonable suspicion).

During the protective sweep the gun was discovered in plain view. Cocaine was discovered in the kilo-size package Garcia had held. The officers then placed Garcia under arrest. By that time there was more than sufficient probable cause for his arrest. He was not illegally arrested and his written consent, thereafter given, for the expanded search was valid.[4]

---

4. Garcia also contends that the deputies improperly opened the package of cocaine after they seized it and that the warrant issued for a search of the apartment on August 11, 1989 was defective. We have carefully reviewed these contentions and have determined that they are without merit.

**C. Ineffective Assistance of Counsel on Section 924(c) Conviction**

After Garcia was sentenced, he filed a petition under 28 U.S.C. § 2255 to set aside his conviction for violating 18 U.S.C. § 924(c)(1).[5] In this petition, he alleged that he had received ineffective assistance of counsel at trial. The district court granted the petition and set aside Garcia's conviction because Garcia's trial counsel had failed to cite *United States v. Phelps*, 877 F.2d 28 (9th Cir.1989), to the district court during trial.

Although the district court had found Garcia guilty of possessing the machine gun, the court determined that counsel's failure to cite *Phelps* prejudiced Garcia. In *Phelps*, the defendant bartered a machine gun for drugs and we held that this did not amount to a violation of section 924(c)(1). *Id.* at 29–30.[6] In the present case, the district court determined that the evidence was insufficient as a matter of law to show that Garcia's machine gun played a role as an offensive weapon in his drug crimes.

We review findings of fact in ineffective assistance of counsel cases for clear error. *United States v. Layton*, 855 F.2d 1388, 1416 (9th Cir.1988), *cert. denied*, 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989). Whether the facts suffice to establish ineffective assistance is a question of law reviewed de novo. *Id.*

To establish ineffective assistance, Garcia must show deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687–90, 104 S.Ct. 2052, 2064–66, 80 L.Ed.2d 674 (1984). The government does not contend that the performance of Garcia's counsel was not deficient, and we therefore do not address the issue. Instead, we turn to the government's argument that there was, in any event, no prejudice.

The Supreme Court recently revisited the prejudice component of the *Strickland* test in *Lockhart v. Fretwell*, — U.S. —, —, 113 S.Ct. 838, 843, 122 L.Ed.2d 180 (1993). There, the Court held that a showing of prejudice requires more than showing that "the outcome would have been different but for counsel's error." *Id.* The convicted petitioner must also show that "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Id.* at —, 113 S.Ct. at 844 (holding Fretwell was not prejudiced although his counsel in his 1985 trial for capital murder failed to raise a federal case which required a lesser penalty because in 1988, while Fretwell's appeals continued, the federal case was overruled, making the initial death sentence fair).

The government first contends that Garcia cannot show "but for" counsel's failure to cite *Phelps* the outcome of his trial would have been different. We need not address this first contention because we agree with the government's next contention, that the result of Garcia's trial was not "fundamentally unfair" because *Phelps* does not control Garcia's case.

We have consistently held that possession of a firearm in a location where it can be used to further a drug crime constitutes use of the weapon under section 924(c), except when a gun is bartered for drugs as in *Phelps*. We have explained:

> If the firearm is within the possession or control of a person who commits an underlying crime as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or

---

5. 18 U.S.C. § 924(c)(1) provides in part:
   "Whoever, during and in relation to any … drug trafficking crime … uses or carries a firearm, shall, in addition to the punishment provided for such … drug trafficking crime, be sentenced to imprisonment for five years … and if the firearm is a machinegun … to imprisonment for thirty years."

6. The viability of our holding in *Phelps* may be in question. The District of Columbia and Eleventh Circuits have disagreed with our holding on identical facts, and the Supreme Court has granted *certiorari* to the Eleventh Circuit to resolve the conflict. *See United States v. Harris*, 959 F.2d 246, 261–62 (D.C.Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 362, 121 L.Ed.2d 275 *and* — U.S. —, 113 S.Ct. 364, 121 L.Ed.2d 277 (1992); *United States v. Smith*, 957 F.2d 835, 836–37 (11th Cir.), *cert. granted*, — U.S. —, 113 S.Ct. 53, 121 L.Ed.2d 23 (1992).

intimidate others, whether or not such display or discharge occurred, then there is a violation of the statute.

*United States v. Stewart,* 779 F.2d 538, 540 (9th Cir.1985) (gun found in trunk of car outside residence where defendant manufactured methamphetamine). We have sustained several convictions under section 924(c) where although the link between the defendant, the gun and the drug trafficking were not obvious, the evidence showed the gun facilitated the commission of the crime. *See United States v. Martinez,* 967 F.2d 1343, 1346 (9th Cir.1992) (machine gun was under the mattress and unloaded; defendant argued that he did not use the room and had never seen the gun); *United States v. Winslow,* 962 F.2d 845, 852–53 (9th Cir.1992) (two loaded guns found in van defendants had used while committing a crime of violence); *United States v. Torres–Medina,* 935 F.2d 1047, 1050 (9th Cir.1991) (paraplegic used gun discovered in basement; evidence showed someone brought him the gun when he sold narcotics); *United States v. Torres–Rodriguez,* 930 F.2d 1375, 1385 (9th Cir.1991) (gun under mattress; held that mere possession can constitute using or carrying); *United States v. Guy,* 903 F.2d 1240, 1243 (9th Cir.1990) (gun was stored in front of a safe containing cocaine and cash).

Here, the evidence showed that the gun was loaded and placed against a wall in the upstairs bedroom. The bedroom was near the closet where the largest cache of drugs was stored. Garcia testified that other drug dealers had placed the machine gun under a mattress, and that he had discovered it and set it against the wall the morning of his arrest. The district court found at trial that Garcia possessed the gun. This finding is not clearly erroneous. Because Garcia possessed a loaded machine gun in an accessible place where it could have been used to embolden him in his commission of the drug trafficking offenses, he used the machine gun during and in relation to a drug trafficking crime within the meaning of 18 U.S.C. § 924(c)(1). *Phelps* does not control this case. Garcia's trial was not "fundamentally unfair" and his conviction of violating 18 U.S.C. § 924(c)(1) should not have been set aside for ineffective assistance of counsel.

## CONCLUSION

In Garcia's direct appeal, *United States v. Garcia,* No. 90–50316, we AFFIRM Garcia's convictions. In the government's appeal from the district court's judgment vacating Garcia's section 924(c)(1) conviction, *Garcia v. Hambrick,* No. 90–56082, we REVERSE. We REMAND to the district court with instructions to reimpose the sentence required under 18 U.S.C. § 924(c). The district court may also wish to consider whether to correct Garcia's sentence on his other convictions to the shortest possible sentence under the United States Sentencing Guidelines, as requested by the government.

